UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARLON WILLIAMS,

                                     Plaintiff,

               v.

CODY GOODFRIEND, RPD, et al.,

                                     Defendants.
_____

<u>DECISION AND ORDER</u>

15-CV-6608L

Plaintiff Marlon T. Williams, appearing *pro se*, commenced this suit pursuant to 42 U.S.C. § 1983. Plaintiff has brought a number of claims against five officers of the Rochester Police Department ("RPD"), arising out of his arrest on June 18, 2014. Defendants have moved for summary judgment dismissing the complaint (Dkt. #36).[1]

## BACKGROUND

On the evening of June 18, 2014, plaintiff was released from jail in Buffalo, New York. He had been arrested for a parole violation. Williams Depo. (Dkt. #36-1 Ex. B) at 16-20.

Plaintiff testified at his deposition in this case that his "baby mother," Keya Thompson-White ("Keya"), bailed plaintiff out of jail. After his release, plaintiff was driven back to Rochester by Keya, his cousins and his brother. *Id.* at 20.

---

[1] Plaintiff originally named the RPD as a defendant as well. His claims against the RPD were dismissed by the Court on June 22, 2016. (Dkt. #7.)

Later that day, the RPD received a call of a man with a gun who had menaced someone in front of a house on North Goodman Street in Rochester. Defendant RPD Officer Cody Goodfriend responded to the call.

Upon arriving at the house, Goodfriend spoke to the victim, Lakesha Jenkins, who told him that she had gotten into an argument with Keya in front of the house. Goodfriend states in an affidavit (Dkt. #36-2) that Jenkins said that while she was arguing with Keya, she saw plaintiff exit a car parked across the street. He walked over, began yelling at her and accused her of "setting up" his brother (who had been shot by someone a few nights earlier). Goodfriend states that Jenkins told him that plaintiff pulled out a handgun and yelled at her, "You gonna die tonight Kesha!," but two men who had been in the car with plaintiff pulled him away from the scene, and he left.

Goodfriend, accompanied by defendant Officer Salvatore Amato, then went to a house on Keller Street, which Jenkins had identified as plaintiff's residence. When they arrived, Goodfriend and Amato found a crowd of people in the front yard. Plaintiff testified at his deposition in this case that "[t]here was a ton" of people at his house, mostly relatives, who were there to welcome him home from jail. Plaintiff's Depo. (Dkt. #36-1 Ex. B) at 24.

Defendants state that shortly after their arrival, they began talking with plaintiff's mother, who was standing outside in the yard. She told them that plaintiff was inside the house. At this point, the parties' versions of the details diverge to some extent.

Defendants contend that as this conversation was going on, outside the house, plaintiff came out of the front door of the house and asked what was going on. Defendants assert that when he was told that he was under arrest, plaintiff yelled, "Hell no! I ain't going nowhere," and

2

ran back into the house. (Dkt. #38 ¶ 16.) Defendants assert that they immediately pursued him into the house.

Plaintiff testified at his deposition that he was in his second-floor bedroom when he heard some commotion downstairs, and that he came downstairs to find his mother and police officers, inside the house. He testified that the officers attempted to persuade him to come outside, but that he responded that if he was not under arrest, he would not do so. (Dkt. #36-1 Ex. B at 29-30.)

What is undisputed is that a physical altercation broke out between plaintiff and defendants, inside the house. Defendants admit that they used force against plaintiff. They state that based on Jenkins's statements about plaintiff brandishing a gun, they decided, and attempted, to arrest plaintiff, but he ran into the house. The officers pursued him, and inside the house they were confronted by several other people (presumably guests of plaintiff, who were there to join in the welcome-home celebration) who began making hostile comments toward the officers.

Defendants state that they tried to apprehend plaintiff, who resisted their attempts. During the ensuing scuffle, plaintiff allegedly backed himself into a corner and assumed a "fighting stance." According to defendants, defendant Amato then struck plaintiff with a closed fist, and as the two men grappled, Amato used his knee to hit plaintiff in the forehead.

At some point, three other officers arrived: Timothy Pancoe, Paul Helfer, and Richard Rodriguez. Eventually, plaintiff ended up on the floor. According to defendants, they attempted to handcuff him, but he continued to resist. After defendant Goodfriend struck plaintiff in the face, plaintiff rolled onto his stomach. Defendant Helfer used his taser against plaintiff, while defendants Rodriguez and Goodfriend continued to strike plaintiff, until they were able to get

3

plaintiff's right arm behind his back and handcuff him. Plaintiff was then taken to a nearby police station, and later to Rochester General Hospital, where he received medical treatment. Def. R. 56 Statement (Dkt. #38.)

That, in a nutshell, is defendants' version of what happened. According to plaintiff, he was upstairs, and when he heard yelling coming from the first floor, he went downstairs, with his two-year-old son in his arms, and found defendants in a confrontation with plaintiff's mother and some of his other relatives. Plaintiff alleges that the officers pushed his mother aside, and that Officer Goodfriend lunged at plaintiff. Plaintiff instinctively attempted to block Goodfriend's punch, and in the ensuing struggle, plaintiff was struck and tased, and eventually lost consciousness. Plaintiff's Depo. Tr. (Dkt. #36-1 Ex. B.) at 49-57. Plaintiff testified that his next memory is of waking up in the back of a police car. *Id.* at 57. Plaintiff has submitted a photograph, apparently taken by an RPD officer, of plaintiff in the back of a police car, with blood stains over much of his face and on his upper right thigh. (Dkt. #42-2.) Again, defendants do not deny that they used a significant amount of force against plaintiff; they simply contend that it was reasonable, under the circumstances.

Following plaintiff's arrest, Goodfriend executed an accusatory instrument, accusing plaintiff of menacing in the second degree (N.Y. Penal L. § 120.14(1)), resisting arrest (N.Y. Penal L. § 205.30), and harassment in the second degree (N.Y. Penal L. § 240.26). Goodfriend Aff. ¶ 40 and Ex. C. Goodfriend later executed a felony complaint adding a charge of assault in the second degree (N.Y. Penal L. § 120.05(3)), and plaintiff was subsequently indicted on those four charges. (Indictment #2014-0925.)

On March 23, 2015, shortly after the start of his jury trial, plaintiff accepted a plea offer, and pleaded guilty to attempted assault in the second degree, in satisfaction of all the charges against him. (Dkt. #36-1 Ex. C.) The statutory basis for the charge was N.Y. Penal L. § 120.05(3), which provides in part that a person is guilty of assault in the second degree when he assaults a police officer with intent to prevent the police officer from performing a lawful duty. Plaintiff was convicted and sentenced to one and a half to three years in prison. *Id.* Ex. D.

Plaintiff commenced this suit in October 2015. He has sued officers Goodfriend, Amato, Pancoe, Rodriguez and Helfer. Plaintiff has asserted claims under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, as discussed in more detail below.

**DISCUSSION**

**I. False Arrest and Malicious Prosecution Claims**

Plaintiff has asserted claims for false imprisonment and malicious prosecution. (Dkt. #1 at 10.) Both claims must be dismissed.

Establishing a claim of false imprisonment–which under New York law is essentially the same as false arrest, *see Donovan v. Briggs*, 250 F.Supp.2d 242, 249 n.6 (W.D.N.Y. 2003)–requires a showing that: (1) the defendants confined the plaintiff; (2) he was conscious of the confinement; (3) he did not consent to the confinement; and (4) the confinement was not otherwise privileged.

The elements of a malicious prosecution claim are: (1) the commencement or continuation of a criminal proceeding by the defendants against the plaintiff; (2) the termination of the proceeding in favor of the accused; (3) the absence of probable cause for the criminal

5

proceeding; and (4) actual malice. *Id.* at 249 (citing *Broughton v. State of New York*, 37 N.Y. 2d 451, 457 (1975)).

The existence of probable cause is a defense to both false imprisonment and malicious prosecution claims. *See Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983") (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (internal quotation marks and citations omitted); *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim") (Sotomayor, J.); *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ("the existence of probable cause is a complete defense to a claim of malicious prosecution").

As to false arrest, that is true if probable cause existed as to any charge, even if not on the charge for which the plaintiff was arrested. *See Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) ("Whether probable cause existed for the charge actually invoked by the arresting officer at the time of the arrest is irrelevant[ to a claim for false arrest]. Accordingly, Defendants prevail if there was probable cause to arrest Plaintiff for any single offense") (internal quotes and citations omitted). Likewise, as to a claim of malicious prosecution, "probable cause is a complete defense ... ." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).

"[A] grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). Plaintiff was indicted for

6

several offenses, including a violation of Penal Law § 120.05(03), and pleaded guilty to an attempt to commit that offense, in violation of Penal Law § 110.00.

In addition, "the Second Circuit has adopted 'the common-law rule, equally applicable to actions asserting false arrest, false imprisonment, or malicious prosecution ... that the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested.'" *Freire v. Zamot*, No. 14-CV-304, 2018 WL 1582075, at *5 (E.D.N.Y. Mar. 30, 2018) (quoting *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986)).

A conviction on any charge for which plaintiff was arrested is conclusive evidence of probable cause to arrest. *Wingate v. Gives*, 725 Fed.Appx. 32, 35 (2d Cir. 2018); *see also Crawley v. City of Syracuse*, No. 17-CV-1389, 2018 WL 3716782, at *3 (N.D.N.Y. Aug. 3, 2018) ("A conviction is conclusive evidence that probable cause existed for an arrest even if the conviction is the result of a guilty plea to or conviction of a lesser charge than that for which plaintiff was arrested"). For that matter, the Second Circuit has stated "that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 154.

Plaintiff's conviction, based on his guilty plea, shows that there was probable cause for his arrest and prosecution. *Wingate*, 725 Fed.Appx. at 35. In addition, plaintiff's conviction "represents a termination of the case that was not in favor of the accused," meaning that "[p]laintiff cannot maintain his claim for malicious prosecution." *Rivera v. City of Yonkers*, 470 F.Supp.2d 402, 408 (S.D.N.Y. 2007). *See also Rothstein v. Carriere*, 373 F.3d 275, 286-87 (2d Cir. 2004) ("A termination is not favorable to the accused ... if the charge is withdrawn or the

7

prosecution abandoned pursuant to a compromise with the accused"). Defendants are therefore entitled to summary judgment on these claims.

## II. Unlawful Entry

Plaintiff alleges that defendants entered his home without a warrant, and without any exigent circumstances that would excuse a warrantless entry, in violation of his rights under the Fourth Amendment.

As outlined above, the parties agree that the defendant officers entered plaintiff's home, but plaintiff's and defendants' accounts of exactly how that transpired differ. Plaintiff alleges that he heard some commotion downstairs, and that when he got to the bottom of the stairs he found RPD officers in his living room, confronting and then pushing their way past his mother.

Defendants contend that while Goodfriend and Amato were standing outside the house, plaintiff came out of the house, and that upon being informed that he was under arrest, he dashed back inside. They contend that they pursued him, primarily out of concern that he was going to fetch a gun inside the house. Again, defendants state that Jenkins had told Goodfriend that plaintiff had brandished a pistol and threatened to kill her a short time earlier.

In support of their motion for summary judgment, each defendant has submitted an affidavit recounting his recollection of the events. Goodfriend and Amato state that they saw plaintiff come out of the house, and that they pursued him back into the house. (Dkt. #36-2, #36-3). Pancoe and Helfer state that when they arrived on the scene, in response to calls for backup, plaintiff, Goodfriend and other people were already inside the house. (Dkt. #36-4, #36-6.) Rodriguez states that when he arrived, he "observed officers attempting to arrest Marlon

8

Williams while other people in the house crowded around the arrest location," so apparently his testimony is that the other officers and plaintiff were inside the house when he arrived. (Dkt. #36-5 ¶ 6.)

In support of their motion for summary judgment, defendants note that at his plea allocution, plaintiff was asked by the prosecutor, "you retreated back into your house, correct?" (referring to the moment when the officers attempted to arrest him), and he responded, "Yes." *See* Dkt. #36-1 Ex. C at 6.

I am not convinced that this establishes, as a matter of law, that defendants' version of the events is accurate. For one thing, although statements made during a plea colloquy are presumed to be true, *see United States v. Khan*, 328 Fed.Appx. 704, 706 (2d Cir. 2009), the strength of that presumption is lessened here by the fact that the exact circumstances of the officers' entry into plaintiff's house was not critical to plaintiff's guilty plea. He was pleading to an attempted-assault charge, and exactly where he or the officers were standing when he first saw them was not an element of the charge.

Second, the question itself was not crystal clear. The colloquy was as follows:

[Prosecutor]: Did there come a time when the police came to [139 Kelly Street]?

[Plaintiff]: Yes, sir.

[Prosecutor]: One of them attempted to place you under arrest; is that correct?

[Plaintiff]: Yes.

[Prosecutor]: Without getting into other charges, you retreated back into your house, correct?

[Plaintiff]: Yes.

9

(Dkt. #36-1 Ex. C at 6.)

Resolving all ambiguities and drawing all reasonable inferences in favor of plaintiff, the non-moving party, as I must, *see Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018), I cannot say as a matter of law that this establishes that plaintiff came out of the house, was told that he was under arrest, and then ran back inside. Plaintiff's testimony could reasonably be interpreted to mean that he "retreated" (in the sense that he ran away from the officers) when he came downstairs, found all them already in the house, and they charged at him. Certainly it could be argued otherwise, but that is not something the Court can decide now, on a written record.

Defendants also argue that by pleading guilty to attempted assault, plaintiff implicitly admitted that at the time of the attempted assault, Goodfriend was engaged in the "lawful duty" of attempting to arrest him. Defendants note that (1) Penal Law § 120.05(3), the statute under which plaintiff was convicted, makes it an offense to cause physical injury to a police officer, with intent to prevent the officer from performing a lawful duty, and that (2) in *Payton v. New York*, 445 U.S. 573, 576 (1980), the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Based on those premises, defendants argue that by pleading guilty, plaintiff implicitly admitted that the officers were lawfully inside his house at the time of his arrest.

On the record before me, the Court cannot rule as a matter of law that, in entering a guilty plea, defendant conceded that the officers had lawfully entered his home. In particular, the Court will not assume that plaintiff should have foreseen that his plea to a criminal-assault charge would necessarily foreclose a later Fourth Amendment civil rights claim. Aside from the

10

aforementioned ambiguous testimony that he "retreated" from the officers, plaintiff did not explicitly state where he or the officers were, when these events began. His terse responses to the prosecutor's questions shed little light on those matters, and to rule as a matter of law that plaintiff must have been outside the house, and that he suddenly ran back in (as defendants claim) would run afoul of the Court's duty to draw all permissible inferences in plaintiff's favor. *Cf. People v. O'Dell*, 137 A.D.3d 1744, 1746 (4th Dep't 2016) (holding that trial court erred, in criminal case, by deciding as a matter of law that police officers validly entered defendant's home without a warrant, and that "the jury was to determine ... whether the police were 'performing a lawful duty'") (quoting Penal L. § 120.05(3)).

Nor am I persuaded by defendants' argument that if plaintiff were to prevail on his unlawful-entry claim, that would necessarily invalidate his attempted-assault conviction, in contravention of *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed." *Id.* at 487. Defendants argue that under *Payton*, if plaintiff were to prevail on his claim of unlawful entry, that would render his arrest unlawful, thus invalidating his conviction.

Both the United States Supreme Court and the Court of Appeals for the Second Circuit have held that Fourth Amendment claims are not automatically barred by *Heck*, simply because the plaintiff was convicted of some underlying crime. *See Fifield v. Barrancotta*, 353 Fed.Appx. 479, 480-81 (2d Cir. 2009) ("Fourth Amendment claims for unlawful arrest ... do not ordinarily fall within the *Heck* rule, since a finding for the plaintiff would not necessarily 'demonstrate the

11

invalidity of any outstanding criminal judgment against the plaintiff,' at least unless the conviction was dependent on evidence obtained as a result of the arrest") (quoting *Heck*, 512 U.S. at 487).

In the case at bar, plaintiff's arrest and conviction were not dependent on evidence obtained as a result of the officers' entry into his home, regardless of whether the entry itself was lawful or unlawful. *See Fifield*, 353 Fed.Appx. at 481 ("a finding that ... a warrantless entry into the home was made to effect an arrest[] would not necessarily call into question the validity of a plaintiff's eventual conviction unless the evidence underlying the conviction was the fruit of such unlawful actions"); *see also Covey v. Assessor of Ohio County*, 777 F.3d 186, 197 (4th Cir. 2015) ("a civil-rights claim does not necessarily imply the invalidity of a conviction or sentence if (1) the conviction derives from a guilty plea rather than a verdict obtained with unlawfully obtained evidence and (2) the plaintiff does not plead facts inconsistent with guilt").[2] I therefore reject defendants' argument based on *Heck*.

### III. Fourth Amendment Excessive Force

Plaintiff alleges that defendants used excessive force to effectuate his arrest. Complaint (Dkt. #1) at 9. Defendants admit that they used force against plaintiff, but contend that the force used was objectively reasonable.

The standard for assessing a claim of excessive force under § 1983 is one of "objective reasonableness," which "requires balancing the nature and quality of the intrusion on the

---

[2] To the extent that defendants' motion is based on the doctrines of collateral estoppel and res judicata, I reject those arguments for essentially the same reasons stated regarding their arguments based on *Heck v. Humphrey*. Plaintiff's guilty plea in the criminal proceeding does not bar, as a matter of law, his civil claims.

plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Three primary considerations guide the Court's application of the standard: (1) the nature and severity of the crime precipitating the arrest; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to flee. *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). *Accord Kisela v. Hughes*, __ U.S. __, 138 S.Ct. 1148, 1152 (2018) (per curiam).

In their Rule 56 Statement (Dkt #38), defendants state (based on the individual defendants' affidavits) that when Goodfriend and Amato "pushed through [a] group of people and attempted to physically apprehend Mr. Williams," Williams swung at Goodfriend, but missed him. Goodfriend and Amato then got hold of plaintiff, and during the ensuing struggle, Amato "struck Mr. Williams in the face twice with a closed fist," and "used his knee to strike Mr. Williams in the forehead two times." Goodfriend "used a straight arm-bar to bring Mr. Williams to the ground," and after plaintiff was taken to the ground, Goodfriend "delivered a downward hammer fist strike to the center of Mr. Williams's face."

Officer Helfer then arrived, and used his taser on the exposed skin of plaintiff's right shoulder. At the same time, Rodriguez, who had joined in the fray, "delivered three knee strikes to Mr. Williams's outer right thigh, while Officer Goodfriend delivered a single straight punch to Mr. Williams's forehead ... ." (Dkt. #38 ¶¶ 21-35.)

According to defendants, all of these measures were reasonably necessary to bring plaintiff under physical control, because he was resisting their efforts to handcuff him.

13

Defendants allege that after plaintiff swung and missed at Goodfriend, he retreated into a corner and assumed a "fighting stance," and that even after plaintiff was taken down to the floor, he refused to put his arms behind his back so that he could be handcuffed. But they do not dispute that they used a significant degree of force against plaintiff.

Plaintiff's account of these events is considerably different. He alleges that after Goodfriend and Amato had been in his house for several minutes, trying unsuccessfully to persuade plaintiff to come outside, the officers "became impatient and lunged towards the plaintiff ... ." (Dkt. #42 ¶ 28.) Plaintiff states that he put one arm up, in an attempt to protect himself, but it appears that by his account, the encounter quickly turned chaotic, and he soon lost consciousness, from the force used against him.

On defendants' motion for summary judgment, the Court cannot simply credit defendants' version of the events. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Ivery v. Baldauf*, 284 F.Supp.3d 426, 436 (W.D.N.Y. 2018) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). Rather, the court must resolve all ambiguities and draw all permissible factual inferences in favor of plaintiff, the non-moving party. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011); *Washington v. Crowley*, No. 13-CV-6630, 2017 WL 3425171, at *2 (W.D.N.Y. Aug. 9, 2017); *Alnutt v. Cleary*, 913 F.Supp. 160, 165 (W.D.N.Y. 1996). The court is not to make credibility determinations on a motion for summary judgment, or to decide between competing inferences. *See Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009).

In the case at bar, the two sides' accounts of what transpired on the night in question, particularly with respect to the officers' use of force, differ in significant and material respects. Even if the Court were to accept defendants' version of the events, I cannot determine, as a matter of law, that a rational finder of fact would have to find in favor of defendants: in other words, that the force used was reasonable, and not excessive. The Court expresses no opinion as to the reasonableness of the force used, but even assuming that plaintiff did resist, as described by defendants, that ultimately is a question for the jury to decide. *See Wilson v. Prince George's County*, 893 F.3d 213, 220-21 (4th Cir. 2018) (reversing district court's grant of summary judgment for defendant officer where the record, viewed in the light most favorable to the plaintiff, could support a conclusion that the officer used excessive force during plaintiff's arrest). *See, e.g., Mutinsky v. Town of Clarkstown*, No. 14-cv-7803, 2018 WL 5266880, at *7 (S.D.N.Y. Oct. 22, 2018) (denying summary judgment for defendants on the ground that, while there was no genuine dispute that plaintiff's foot "went up" during scuffle with officer, reasonable jury could find that officer's use of taser constituted excessive force).

**IV. Personal Involvement: Defendant Pancoe**

Defendants also contend that there is insufficient evidence that defendant Pancoe was personally involved in the events immediately surrounding plaintiff's arrest. In order to establish an actionable constitutional claim, plaintiff must demonstrate some personal involvement by the defendant in the constitutional violation. *See Warheit v. City of New York*, 271 Fed.Appx. 123, 126 (2d Cir. 2008); *Soto v. LaBuzzetta*, 584 F.Supp.2d 589, 603 (W.D.N.Y. 2008).

15

Pancoe states in his affidavit (Dkt. #36-4) that at the time of the events in question, he was a sergeant in the RPD, and that he responded to a call. According to Pancoe, when he arrived at the house, at about 9:30 p.m., several officers were already inside. He states that a neighbor directed him to a side door, which he used to enter the house.

Once he was inside, Pancoe states, he saw Goodfriend, who told him that the officers were attempting to arrest plaintiff for menacing someone with a gun, which they thought might be somewhere in the house. Pancoe then tried to stop or dissuade others in the house from getting involved, while his fellow officers were engaged in arresting plaintiff. *Id.* ¶¶ 5-14.

Plaintiff does not allege that Pancoe was directly involved in his arrest, or the physical altercation leading up to his arrest. Plaintiff's claim against Pancoe appears to be based solely on Pancoe's status as a sergeant, and his presence at the scene.

The mere fact that Pancoe held a higher rank than the other officers is not enough to render him liable for the other officers' alleged use of excessive force. *See Allah v. Poole*, 506 F.Supp.2d 174, 193 (W.D.N.Y.2007) (defendants' supervisory status alone was not enough to establish their personal involvement in alleged constitutional violation). And even giving plaintiff's account of the events the most generous reading, there is no indication in the factual record that Pancoe participated in the officers' use of force, or that he was in a position to intervene. The evidence shows only that Pancoe was attempting to deal with the other people in the house during plaintiff's arrest, and that his attention was focused on those individuals, not on what was happening with plaintiff. The claim against Pancoe must therefore be dismissed, for lack of personal involvement.

## V. Qualified Immunity

Defendants also argue that they are entitled to summary judgment based on qualified immunity. Qualified immunity shields public officials, including police officers, from an action for civil damages, to the extent that their challenged acts do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine applies where it is "objectively reasonable" for an official to believe that his conduct did not violate such a right, in light of clearly established law and in the information possessed by the official. *See Simms v. Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997). In determining whether defendants are entitled to qualified immunity, the Court must focus on "objective circumstances rather than an officer's subjective motivation." *Bradway v. Gonzales*, 26 F.3d 313, 319 (2d Cir. 1994).

The Supreme Court has recently re-emphasized that "it is sometimes difficult for an officer to determine how the relevant legal doctrine, [such as] excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S.Ct. at 1152 (quoting *Mullenix v. Luna*, 577 U.S. __, 136 S.Ct. 305, 308 (2015) (per curiam)). The Court in *Kisela* reversed a court of appeals' decision holding that a police officer was not entitled to qualified immunity, where the officer shot a woman who was holding a large kitchen knife, had taken steps toward another woman, and had refused officers' commands to drop the knife. The Supreme Court stated that this was "far from an obvious case in which any competent officer would have known that shooting [the knife-wielder] to protect [the other woman] would violate the Fourth Amendment." 138 S.Ct. at 1153.

But as the Court in *Kisela* pointed out, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case ... .'" *Id.* (quoting *Mullenix*, 136 S.Ct. at 309). Viewing the record in this case in the light most favorable to plaintiff, defendants Goodfriend and Amato rushed at him while he was standing on the stairs in his home, he instinctively raised one arm in self-defense, and then four officers pummeled and tased him until he lapsed into unconsciousness. If that is what happened, it is difficult to see how a reasonable officer could have thought that his actions were permissible. *See Merrill v. Schell*, 279 F.Supp. 3d 438, 447-48 (W.D.N.Y. 2017) (stating that "[n]o reasonable police officer could possibly have believed that what [the plaintiff] has alleged was 'legitimately require[d]' by his or her duties. ... On the contrary, it was unnecessary, gratuitous, and excessive by definition") (quoting *Harlow*, 457 U.S. at 819).

The Court acknowledges that–as pointed out by defendants–plaintiff had allegedly just threatened to kill someone, and there was reason to think that he might have had a gun in the house. But for the Court to grant summary judgment for defendants on this ground would require the Court to invade the province of the jury by making findings of fact. That, the Court may not do.

## CONCLUSION[3]

Defendants' motion for summary judgment (Dkt. #36) is granted in part and denied in part.

Plaintiff's claims for false arrest and malicious prosecution are dismissed. All of his claims against defendant Pancoe are dismissed.

In all other respects, defendants' motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
November 16, 2018.

---

[3] Though any plaintiff has the right to proceed *pro se*, and there is no constitutional right to appointed counsel in civil cases, plaintiff might be well advised to seek counsel to represent him, going forward. It appears that this case will proceed to trial, and plaintiff might be well served by having the benefit of counsel. The Monroe County Bar Association's Lawyer Referral Service might be a good place to start.